IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case 12 CR 516 |
| | ) |
| Kenneth Bell and Antonio Walter, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

On October 24, 2013, a jury convicted defendants Kenneth Bell and Antonio Walter of a conspiracy to distribute heroin that lasted from 2007 until in or about November of 2010. Before me is defendants' motion for a new trial, which argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to defendants, prior to the close of trial, statements that government witness Dushae Nesbitt made to a law enforcement agent outside the courtroom on the day of his testimony. Defendants argue that Nesbitt's out-of-court statements were favorable to them because 1) they impeached Nesbitt's trial testimony and the testimony of another government witness, Edmund Forrest; and 2) they suggested an alternative perpetrator of the crimes with which defendants were charged.

For the reasons that follow, I deny defendants' motion.

I.

The government's case against defendants included testimony from seven cooperating witnesses, law enforcement agents who testified about heroin seizures made in the course of their investigation, and, as to Bell, financial records and the testimony of both Bell's former girlfriend and a financial investigator. The trial lasted approximately two weeks.

On October 22, 2013, Nesbitt, the government's last cooperating witness, told a law enforcement agent that Forrest, who had already testified, was still selling drugs and was "at the table" (i.e., mixing and packaging heroin for distribution) on a regular basis. Nesbitt further told the agent that Forrest was selling drugs for someone nicknamed "KMART." The agent relayed this information to the government's attorneys either later that day or the following morning, which was the last day of trial. The government did not disclose Nesbitt's statements to defense counsel at that time.

After trial, the government met with Nesbitt on two occasions to investigate his statements to the agent. After each meeting, the government sent defense counsel a letter disclosing its communications with Nesbitt. The first letter, dated December 18, 2013, stated:

> On or about October 22, 2013, FBI Agent Helen Dunn had a conversation with DuShae Nesbitt outside of Judge Bucklo's courtroom in the Dirksen Building. Nesbitt told

> Agent Dunn that Edmund Forrest is still selling drugs and is "at the table" on a regular basis. According to Nesbitt, Forrest is selling drugs for FNU LNU a/k/a "KMART," who is a cousin of Steven Collins a/k/a "Cupcake." Nesbitt said that Forrest is using Collins' apartment near Chicago Avenue and Spaulding Street in Chicago.
>
> On December 18, 2013, I interviewed DuShae Nesbitt at the State's Attorney's Office at 26th and California in Chicago. AUSA Maribel Fernandez-Harvath, FBI Task Force Officer Michael Lipsey, and Robert Crowe were present. Crowe is an attorney on the Federal Defender Panel who represented Nesbitt in connection with his testimony in the federal case. The purpose of the interview was to ask Nesbitt for additional information about his knowledge of Forrest's alleged drug dealing, and to ask him for the basis of his knowledge. Nesbitt and his attorney informed the government that his basis of knowledge related to Nesbitt's pending state case. At that time, the government advised Nesbitt that it could not ask Nesbitt any more questions about the topic since Nesbitt is represented on the state case and the government had not spoken to his defense attorney in the state case about interviewing him. The government is going to contact Nesbitt's state defense attorney to see if the defense attorney will allow the government to interview Nesbitt about this during January 2014.

Mot., Exh. A. DN 127-1. The second letter, dated February 10, 2014, stated:

> This is a follow up to my letter of December 18, 2013. I learned recently that DuShae Nesbitt pled guilty to his pending state drug cases in late January 2014, and was sentenced to 6 years' imprisonment. I interviewed Nesbitt today at a state correctional facility with CPD Officer Masud Hadairi:
>
> Nesbitt said that Forrest was "at the table" mixing heroin for street distribution from at least June 2013 until September 2013. Nesbitt knows this because Nesbitt saw Forrest "at the table" two or three times during that time period. They were mixing heroin for the Chicago/Christiana drug spot, which was selling about $3,000-$4,000 of heroin per day. The apartment they used

> to mix the heroin was on Cicero near Madison. Nesbitt was running bundles and "working packs" at Chicago/Christiana, which led to the two state cases that Nesbitt recently pled guilty to. Nesbitt said he also gave Forrest money from heroin sales on occasion during that period and saw others give Forrest money from heroin sales. Nesbitt said that FNU LNU aka "K-MART" was running the Chicago/Christiana drug spot.
>
> Based on conversations with Forrest, Nesbitt believes that Forrest may have been "at the table" for Chicago/Christiana prior to June 2013 as well.
>
> Nesbitt also said that Forrest told Nesbitt that Forrest went to Miami for several days during the summer of 2013 with his "baby momma."
>
> As you know, Forrest was on bond for his federal case during 2013. He is currently in custody.

Mot., Exh. B. DN 127-2.

Defendants argue that if they had known about Nesbitt's statements to the agent, they could have asked Nesbitt the same follow-up questions the government did in its post-trial meetings with him, and they could have used his answers to impeach Forrest's and Nesbitt's trial testimony. Specifically, defendants argue, they could have shown that Forrest was dealing drugs at the same time he was cooperating with the government, and was violating the terms of his bond. They could also have argued, based on this evidence, that Nesbitt and Forrest were engaged in a separate drug conspiracy at the time of their testimony, and that Nesbitt therefore had both a motive to testify consistently with Forrest (who was above him in the conspiracy's pecking order), and

sufficient contact with Forrest to allow the two to formulate a story that incriminated defendants.

In addition to these impeachment theories, defendants assert that Nesbitt's statements were also exculpatory because they suggested that KMART, not Bell and Walter, supplied heroin to the Chicago/Christiana drug spot.

Defendants assert that the prejudice they suffered as a result of the government's suppression of Nesbitt's statements was compounded by my pre-trial decision denying their emergency motion for a continuance. In that motion, defendants argued that the government's "late" disclosure of Nesbitt as a trial witness on October 10, 2013 (at which time it also disclosed Nesbitt's Jencks material), prevented them from investigating him adequately to prepare for his cross-examination. In response to defendants' motion, the government agreed to call Nesbitt as its final witness, leaving defendants approximately two weeks to prepare to question him.

## II.

"A *Brady* claim has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the government; and (3) the evidence must be material, that is, there must be 'a reasonable probability that the suppressed evidence would have produced a different verdict.'"

5

*U.S. v. Morales*, 746 F.3d 310 (7th Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

The parties agree that Nesbitt's statement was favorable to defendants because it impeached Forrest's credibility by revealing that he was engaged in illegal activity while on bond and cooperating with the government. They dispute whether the government "suppressed" this information, however, since, in the government's view, statements by defendants' counsel during a hearing on their motion to continue suggested that they knew before the government did that Forrest was still dealing drugs. *See e.g., United States v. Mahalick*, 498 F.3d 475, 478-79 (7th Cir. 2007) ("*Brady* requires disclosure only of exculpatory material known to the government *but not to the defendant*") (original emphasis) (citation omitted) (superseded by statute on other grounds). In any event, the government points out, defendants learned about Forrest's ongoing drug dealing at the latest during Nesbitt's trial testimony, when Nesbitt confirmed that Forrest was "still out at Chicago and Christiana," which, in context, plainly meant that he was still dealing drugs on that corner. Tr. at 1006. Finally, the parties dispute whether Nesbitt's statement that Forrest was selling drugs for "KMART" was exculpatory.

I need not linger on the question of whether the government's failure to disclose Nesbitt's statements amounts to "suppression" because even assuming that it did, I am amply persuaded that

6

disclosure of this evidence prior to the end of trial would have had no discernable effect on its outcome. "[E]vidence is material for *Brady* purposes only if there is a 'reasonable probability' that its disclosure to the defense would have changed the result of the trial." *United States v. Morales,* 746 F.3d 310, 315 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). Under this standard, newly discovered impeachment evidence ordinarily does not warrant a new trial. *Id*. at 317 (quoting *U.S. v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009)) (alterations omitted). While defendants need not prove that disclosure of the evidence would more likely than not have resulted in an acquittal, they must nevertheless show that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 316. That is not the case here.

To begin, although defendants characterize Forrest and Nesbitt as the "central witnesses" in the government's case, this portrayal does not comport with the record. While it is true that both witnesses incriminated defendants—Nesbitt testified, among other things, that Walter's role in the conspiracy was to "get heroin to Timmy Allison and Edmund Forrest," and that Bell's role was "to make sure drugs was out there," Tr. 933, 939-40, while Forrest testified, for example, that he saw Bell bring heroin to the table on a weekly basis during 2008, Tr. 396, that he gave

7

money from heroin sales to Walter on a daily basis that same year, Tr. 422, and that "Bell supplied [Walter], and [Walter] supplied us," Tr. 425—the government's assessment of Forrest, in particular, as "not a particularly strong government witness" is apt. A review of Forrest's testimony reveals numerous inconsistencies, which defense counsel was quick to highlight, along with many other shortcomings in his testimony.

Indeed, Forrest was subject to a lengthy and excoriating cross-examination that touched on topics including: his participation in a conspiracy involving ninety-three kilograms of heroin; his multiple prior convictions; his involvement in trafficking more than 100 firearms to gang members, including while on bond; other violations of his bond, and the fact that his bond had not been revoked, even though the government was aware of the violations; the fact that he could not initially remember certain aspects of Bell's and Walter's involvement in the charged conspiracy, but then claimed his memory was refreshed by his prior statements; the fact that he met with the government's counsel during a break on his direct examination (which he initially denied but then later admitted), and that his testimony after the break was different from his testimony before the break; his involvement in shootings, including one in which a person died; the fact that the government gave him immunity for those acts prior to testifying; and his cooperation agreement with the

government, finalized just days before trial, pursuant to which the government promised to recommend fifteen years off Forrest's Guidelines sentencing range of 360 months to life imprisonment, and allowed Forrest's counsel to argue for as few as ten years. Forrest's cross-examination on these topics thoroughly exposed possible bases for bias, and left no doubt about his lengthy history of untruthfulness and unlawful conduct. There simply is no reasonable possibility, considering Forrest's testimony as a whole, that additional impeachment based on evidence of Forrest's ongoing drug dealing would have influenced the jury's assessment of his credibility.

Moreover, Forrest's testimony about defendants' roles in the conspiracy was largely corroborated—if not in every last detail—by the testimony of the government's other witnesses, including Nesbitt. By the time Nesbitt took the stand, Jessica Ramey, Christopher Bonds, LaToya Taylor, Calvin Williams, and Jeffrey Scott had all testified to various aspects of the conspiracy, incriminating one or both defendants. A few examples, which are illustrative rather than exhaustive, follow.

Ramey testified that she stored heroin for the Chicago/Christiana and St. Louis/Ohio drug spots at her grandmother's house. She explained that one of several people would drop the heroin off with her, and that she would take it the next day to the "pack workers" who would sell it on those corners.

9

Ramey testified that she saw Bell pick up stacks of cash from heroin sales from Forrest's apartment and put it in his pocket. Ramey further stated that she believed, based on a conversation in which she heard Forrest and another drug dealer, Timothy Allison, refer to Bell as "the store," that Bell supplied the heroin distributed at the Chicago/Christiana and St. Louis/Ohio drug spots.

LaToya Taylor testified that she worked at the St. Louis/Ohio drug corner and that Walter was one of the "big guys" at that spot. Taylor explained that when the workers didn't have drugs to sell, they would call one of the "big guys" to make sure they got some. She testified that on some occasions, such as when Forrest and Allison were incarcerated, she received heroin directly from Walter. She also testified that sometimes she would turn in the money from the heroin sales to Walter.

Jeffrey Scott testified that in April of 2008, Bell began supplying heroin for a drug spot at Kedzie and Ohio. Scott stated that he met with both defendants in a car, and that Bell explained that he would supply Scott and another dealer, Jason Austin, with eight-pack bundles of heroin, which they would sell for $10 per bag. Scott further testified that he began working at the St. Louis/Ohio drug spot in 2010, and that Walter and Bell supplied the heroin for the spot at that time.

Finally, Nesbitt testified to his knowledge of narcotics trafficking at the Chicago/Christiana drug spot during the portions of 2007 to 2009 that he was not incarcerated. Nesbitt stated that he sometimes went "to the table" to mix heroin in 2009, and that each time he was at the table, Walter was also there. Tr. 948. Nesbitt testified that he also saw Bell at the table, "counting his money, getting his money." *Id*. Nesbitt said that he saw Walter give Bell heroin on some occasions, that he saw Walter give Bell cash from heroin sales on a number of occasions, and that he saw Timothy Allison give Walter cash from heroin sales on a number of occasions. Tr. 948-49.

Defendants' claim that Nesbitt's out-of-court statement "would have allowed the jury to see Nesbitt's testimony in a whole different light" because it suggested that Nesbitt and Forrest were involved in an ongoing drug conspiracy, and thus might be colluding to incriminate defendants, does not survive scrutiny. First, "the effect that a particular piece of evidence is likely to have had on the outcome of the trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial." *Morales*, 746 F.3d at 316. Even setting aside the fact that Nesbitt's testimony was essentially consistent with the testimony of several other witnesses, Nesbitt, like Forrest, was cross-examined extensively

about a range of topics, all of which potentially eroded his credibility in the eyes of the jury.

More importantly, among the topics covered in Nesbitt's cross-examination was the fact that Nesbitt had been arrested for selling heroin at Chicago and Christiana just four weeks before testifying at trial. As noted above, Nesbitt also testified on cross that Forrest, too, was "out at Chicago and Christiana" during the same period. Accordingly, the very facts that defendants claim raise inferences that Nesbitt and Forrest were colluding, or that Nesbitt might be biased by the desire to support Forrest's testimony, were before the jury, and defendants were free to argue these theories in closing. And while defendants complain that their inability to develop evidence to substantiate these theories was exacerbated by my denial of their motion for a continuance, it bears noting that although seven months elapsed between the government's disclosure of its communications with Nesbitt and defendants' filing of the present motion, the motion does not present any evidence uncovered during that period that would raise their collusion or bias theories above the level of speculation. *See Morales*, 746 F.3d at 317 ("mere speculation" insufficient to show *Brady* materiality). Thus, even assuming that defendants would have investigated the connection between Forrest and Nesbitt if the government had disclosed Nesbitt's out-of-court statements (or if I had continued

the trial), there is nothing in their motion to suggest that their additional inquiries would have yielded any concrete evidence to support a collusion/bias argument.

In any event, Nesbitt's trial testimony reveals how unlikely these theories would have been to change the outcome of the trial. As the government points out, the jury heard that Nesbitt was in Stateville state prison when he was first approached by law enforcement in May of 2011, and that Nesbitt told agents at that time that Bell was supplying the heroin in the alleged conspiracy. Nesbitt also told agents that he, Walter, Forrest, and others, "bagged up at the table." Tr. 1009. The government argues persuasively that in view of this testimony, defendants' theory that Forrest and Nesbitt made up a story to incriminate defendants while they were dealing drugs together in 2013 would have gone nowhere, as it would have flown in the face of Nesbitt's prior consistent statements.

Defendants' final argument—that Nesbitt's identification of "KMART" as the supplier of the Chicago/Christiana drug spot is exculpatory because it suggests an alternative perpetrator—merits little discussion. Defendants concede, as they must, that evidence that another individual was controlling the same drug spots three years after the alleged conspiracy ended (and while defendants themselves were incarcerated) does not directly exculpate them of the charges against them. They argue, however,

that the jury might have inferred, based on evidence that a drug conspiracy continued to exist at the corner of Chicago and Christiana, and that it involved some of the same individuals, that Nesbitt, Forrest, and others colluded to protect the spot's "true" supplier. This theory merely builds upon defendants' speculative and implausible collusion theory. Nothing about Nesbitt's identification of KMART as a supplier in 2013 suggests, on its face, that Bell and Walter were not supplying and managing the drug spots between 2007 and November 2010, and defendants offer no basis for concluding that further investigation into KMART would have produced any concrete, exculpatory evidence.

III.

For the foregoing reasons, defendants' motion for a new trial is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: December 22, 2014