IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Case 12 CR 516 |
| | ) |
| | ) |
| Kenneth Bell and Antonio Walter, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

On October 24, 2013, a jury convicted defendants Kenneth Bell and Antonio Walter of a conspiracy to distribute heroin lasting from 2007 until in or around November of 2010. Before me is Bell's fourth motion for a new trial, in which Walter joins, which argues that new evidence—a letter that Edmund Forrest, one of seven cooperating witnesses who testified at defendants' trial, sent to Bell's counsel while Forrest and Bell were incarcerated at the Metropolitan Correction Center ("MCC") in Chicago—warrants a retrial. For the following reasons, I deny the motion.

I.

The letter on which Bell's motion rests states, in full:

> I <u>Edmund Forrest</u> testified at trial on Kenneth Bell A.K.A. "KB." The things I said about conspiring to sell drugs with him weren't "<u>true</u>". I was pressured

> by all parties involved including the Government. I initially agreed to testify which was a 12 hour decision I had to make was (sic) because of the promises that were made to me. Like I said from the beginning, I never delt (sic) with Mr. Bell involving drug transactions etc... Yes we were around one another because of our friendship not the dealings of drugs. I am writing this brief letter on my own free will because I felt/and still feel bad about how things transpired. I'm sorry for not being totally honest about my testimony and my goal is to bring some clarification to my conscience.
>
> Respectfully yours,
> Edmund Forrest

Mot., Exh. A (DN 173-1) (original underline).

Bell argues that this letter amounts to a global recantation of Forrest's trial testimony and warrants a new trial under *United States v. Reed*, 2 F.3d 1450-52 (7th Cir. 1993). In *Reed*, the court explained that district courts use a three-part test to determine whether to exercise their discretion to grant a new trial on the ground that newly discovered evidence discloses false testimony. This test, which was first articulated in *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928), asks whether:

> (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) The jury might have reached a different conclusion absent the false testimony or if it had known that testimony by a material witness was false. (c) The party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Reed,* 2 F.3d at 1451 (quoting *United States v. Reed*, 986 F.2d 191, 192–93 (7th Cir. 1993)). The Seventh Circuit has explained that the *Larrison* test, which applies specifically to newly discovered evidence disclosing false testimony, is distinct from the "general" test for newly disclosed evidence. Under the general test, a defendant must show "that the evidence (1) came to [his] knowledge only after trial; (2) could not have been discovered sooner and [he] exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial." *Reed*, 2 F.3d at 1451 (7th Cir. 1993) (original alterations) (citation omitted).[1]

---

[1] The careful reader will observe that there are two Seventh Circuit cases from 1993 captioned *United States v. Reed*, both of which analyze whether newly discovered evidence warrants a new trial under Fed. R. Crim. P. 33. To add to the confusion, the *Reed* cases offer conflicting statements about whether the three-part *Larrison* test is more or less stringent than the four-part "general" test. *Compare* 2 F.3d at 1451 (applying both tests and describing the three-part false testimony test as the "more stringent") *with* 986 F.2d at 193 (applying three-part false testimony test rather than "the stricter standards applicable to new trial motions based on newly discovered evidence generally"). In this respect, the *Reed* case published at 2 F.3d 1441 appears to be an outlier, as several other cases have confirmed that the *Larrison* test is the "more lenient." *E.g. United States v. Mazzanti*, 925 F.2d 1026, 1030 (7th Cir. 1991) (citing *United States v. Goodwin*, 770 F.2d 631, 639 n. 2 (7th Cir. 1985); and *United States v. Olson*, 846 F.2d 1103, 1112 (7th Cir. 1988)). As discussed below, the instant motion implicates both tests, but it does not require me to try to harmonize *Reed*, 2 F.3d 1441, with the apparently prevailing view that the three-part *Larrison* test is more lenient than the four-part "general" test.

II.

Bell's motion takes the first prong of the *Larrison* test for granted, asserting, without analysis, that it is "surely satisfied" because Forrest himself stated that his trial testimony was false. But this conclusory argument fails to take account of the Seventh Circuit's skepticism of witness recantations in general. *See, e.g., U.S. v. Griffin*, 84 F.3d 912, 929 (7th Cir. 1996) (noting that district court's skepticism about witness's recantation was "consistent with our own views of recantations in general"); *Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993) ("[i]t is a truism that our courts treat recantations with skepticism"); *U.S. v. Leibowitz*, 919 F.2d 482, 483 (7th Cir. 1992) ("[j]udges view recantation dimly"); *U.S. v. Kamel*, 965 F.2d 484, 494 n. 25 (7th Cir. 1992) ("[r]ecanting affidavits and witnesses are viewed with extreme suspicion.").

Moreover, Forrest's recantation in particular is similar to the one the Seventh Circuit held, in *U.S. v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010), was insufficient to meet the first prong of the *Larrison* test. In *Taylor*, the Seventh Circuit affirmed the district court's denial, without an evidentiary hearing, of a motion seeking a new trial based on the affidavit of a trial witness who recanted his testimony that the defendant had "recruited" him to participate in a conspiracy to steal

drugs, and that he had "discussed the plan to steal the load of drugs" with the defendant on the way to the location of the planned heist. 600 F.3d at 866-67. In his affidavit, the witness stated that he had "testified against Taylor out of fear of a life sentence, but that he and Taylor had never spoken of the drug heist." *Id*. at 867. The Seventh Circuit explained that the witness's trial testimony "was consistent with the testimony of two other witnesses," as well as with video footage and physical evidence of the defendant's involvement in the conspiracy, while his recantation was at odds with this corroborating evidence. Accordingly, the court was not reasonably satisfied that the trial testimony was false. *Id*. at 870. The court further explained that if the recanting witness's incriminating trial testimony was false, Taylor would have known of its falsity at the time of trial and "had ample opportunity to refute the testimony through cross-examination." *Id.* For this reason, too, the district court was within its discretion to determine that the defendant failed to satisfy the *Larrison* test. *Id*.

The same analysis obtains here. Forrest's trial testimony incriminating Bell was broadly consistent with the testimony of several other witnesses, as indeed I explained in my decision denying Bell's motion for a retrial based on putative *Brady* evidence. *See* Mem. Op. and Order of 12/22/14 at 9-11 (DN 163).

5

Bell argues that the testimony of the government's other cooperating witnesses—Nesbitt, Ramey, Scott, and Proctor—did not corroborate Forrest's "detailed" and "extensive" account of Bell's involvement in drug trafficking. But the testimony of these witnesses need not echo the precise details Forrest recounted of Bell's involvement in the conspiracy to corroborate his overall description of Bell's role as the supplier of heroin to Walter and others. While it is true that the statements of the cooperating witnesses varied in their particulars according to each witness's role in the conspiracy, taken together they painted a coherent picture of each defendant's participation in the scheme:

> Ramey testified that she stored heroin for the Chicago/Christiana and St. Louis/Ohio drug spots at her grandmother's house. She explained that one of several people would drop the heroin off with her, and that she would take it the next day to the "pack workers" who would sell it on those corners. Ramey testified that she saw Bell pick up stacks of cash from heroin sales from Forrest's apartment and put it in his pocket. Ramey further stated that she believed, based on a conversation in which she heard Forrest and another drug dealer, Timothy Allison, refer to Bell as "the store," that Bell supplied the heroin distributed at the Chicago/Christiana and St. Louis/Ohio drug spots.
>
> LaToya Taylor testified that she worked at the St. Louis/Ohio drug corner and that Walter was one of the "big guys" at that spot. Taylor explained that when the workers didn't have drugs to sell, they would call one of the "big guys" to make sure they got some. She testified that on some occasions, such as when Forrest and Allison were incarcerated, she received heroin directly from Walter. She also testified that

6

>   sometimes she would turn in the money from the heroin sales to Walter.
>
>   Jeffrey Scott testified that in April of 2008, Bell began supplying heroin for a drug spot at Kedzie and Ohio. Scott stated that he met with both defendants in a car, and that Bell explained that he would supply Scott and another dealer, Jason Austin, with eight-pack bundles of heroin, which they would sell for $10 per bag. Scott further testified that he began working at the St. Louis/Ohio drug spot in 2010, and that Walter and Bell supplied the heroin for the spot at that time.
>
>   Finally, Nesbitt testified to his knowledge of narcotics trafficking at the Chicago/Christiana drug spot during the portions of 2007 to 2009 that he was not incarcerated. Nesbitt stated that he sometimes went "to the table" to mix heroin in 2009, and that each time he was at the table, Walter was also there. Tr. 948. Nesbitt testified that he also saw Bell at the table, "counting his money, getting his money." *Id*. Nesbitt said that he saw Walter give Bell heroin on some occasions, that he saw Walter give Bell cash from heroin sales on a number of occasions, and that he saw Timothy Allison give Walter cash from heroin sales on a number of occasions. Tr. 948-49.

Mem. Op. and Order of 12/22/14 at 9-11 (DN 163). This summary of witness testimony (which I noted was "illustrative rather than exhaustive") confirms that, like the recantation in *Taylor*, Forrest's statement that the "things" he said about conspiring to sell drugs with Bell "weren't 'true'" is at odds with the testimony of other witnesses, as well as with the government's financial evidence of Bell's unexplained wealth. Under these circumstances, Forrest's global recantation of his incriminating testimony does not meet the first prong of *Larrison*.

7

This case further mirrors *Taylor* in that if Forrest's incriminating trial testimony was untrue, defendants had ample opportunity to test it through cross-examination. Indeed, I previously observed that defendants availed themselves of this opportunity at length:

> Forrest was subject to a lengthy and excoriating cross-examination that touched on topics including: his participation in a conspiracy involving ninety-three kilograms of heroin; his multiple prior convictions; his involvement in trafficking more than 100 firearms to gang members, including while on bond; other violations of his bond, and the fact that his bond had not been revoked, even though the government was aware of the violations; the fact that he could not initially remember certain aspects of Bell's and Walter's involvement in the charged conspiracy, but then claimed his memory was refreshed by his prior statements; the fact that he met with the government's counsel during a break on his direct examination (which he initially denied but then later admitted), and that his testimony after the break was different from his testimony before the break; his involvement in shootings, including one in which a person died; the fact that the government gave him immunity for those acts prior to testifying; and his cooperation agreement with the government, finalized just days before trial, pursuant to which the government promised to recommend fifteen years off Forrest's Guidelines sentencing range of 360 months to life imprisonment, and allowed Forrest's counsel to argue for as few as ten years.

Mem. Op. and Order of 12/22/14 at 8-9 (DN 163). For this reason, the government argues, Forrest's recantation also fails under *Taylor* to meet the third prong of the *Larrison* analysis.

Bell argues, however, that the government's reliance on *Taylor* "misapprehends the issue" raised by Forrest's

recantation. Homing in on Forrest's statement that he was "pressured by all parties involved including the Government," Bell insists that the letter amounts to new evidence that Forrest may have been "pressured by government agents or attorneys behind closed doors," and that defendants did not know about—and thus could not have cross-examined Forrest about—the pressure Forrest attributes to the government. This argument fails on several fronts.

To begin, the text of Forrest's letter does not support the nefarious image Bell conjures of government agents "unduly" pressuring him "behind closed doors." Indeed, in the only statement referring to "pressure," Forrest claims to have felt pressured "by all parties involved." Whatever this statement may mean, it offers no concrete basis for Bell's speculation that government agents secretly exerted improper influence over Forrest's testimony, much less does it support Bell's conjecture that other cooperating witnesses may have been improperly influenced. To the contrary, Forrest's letter goes on to provide additional information about the "pressure" he claims to have felt, explaining that he agreed to testify "because of the promises that were made to me." But the fact that the government made "promises" to Forrest in exchange for his trial testimony is certainly nothing new. Indeed, as noted above, Forrest was questioned extensively about his cooperation

9

agreement with the government during cross-examination, and defense counsel spared no effort to expose Forrest's incentives to testify consistently with the government's theory, or to reveal possible sources of bias. Accordingly, the letter's vague reference to "pressure" by the government and others does not materially distinguish Forrest's recantation from the one found wanting in *Taylor*. *See also Reed*, 2 F.3d at 1451 ("mere speculation or conjecture is insufficient to warrant a new trial" under either *Larrison* or the general test for newly discovered evidence).

Moreover, what Bell's effort to distinguish *Taylor* brings into focus is that Forrest's letter contains two types of newly disclosed evidence. The first—Forrest's recantation of his substantive testimony against Bell (e.g., "the things I said about conspiring to sell drugs with [Bell] weren't 'true'")—discloses false testimony because, if true, it necessarily negates the truth of his incriminating trial testimony. Accordingly, the *Larrison* test is the appropriate analytical framework for determining whether the statements warrant a new trial. But the second—Forrest's statement that he was "pressured by all parties including the Government"—does not, on its face, indicate that his trial testimony was false. Indeed, Forrest's trial testimony could have been *both* the product of

"pressure" *and* true.[2] Accordingly, the general new evidence test (which the *Taylor* court applied to the affidavit of a non-testifying witness), offers the more appropriate framework for analyzing Forrest's assertion of "pressure." As noted above, under this test, Bell "must show that the evidence (1) came to [his] knowledge only after trial; (2) could not have been discovered sooner and [he] exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial. *Reed*, 2 F.3d at 1451 (citation omitted).

Bell makes no effort to satisfy the general test.[3] For reasons explained above, however, Forrest's vague statement about "pressure" falls short on multiple fronts: It stumbles on elements one and three because it is merely cumulative of

---

[2] On this distinction in the constitutional context, see *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (explaining that "[c]oerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").

[3] Bell instead tries to squeeze Forrest's statement about "pressure" into *Larrison*'s analytical framework by arguing that it "contradicts his sworn statements that he was not being unduly pressured or influenced to provide his testimony at trial and that all he was told to do was tell the truth." Reply at 3. Bell does not identify any specific testimony by Forrest on this topic, but in any event, even assuming that Forrest disclaimed any undue pressure or influence by the government, the letter does not, as explained above, contradict statements Forrest may have made to that effect while under oath.

evidence presented at trial of "promises" the government made to Forrest, and other benefits it offered him, in exchange for his testimony, which the jury heard about in relentless detail.  The evidence likewise fails with respect to the fourth element, which requires Bell to show that disclosure of the "pressure" Forrest describes in his letter would "probably" lead to Bell's acquittal in the event of a retrial.  None of Bell's arguments comes close to meeting this high bar.

As Bell himself underscores, the jury observed firsthand the changing and inconsistent nature of Forrest's testimony; indeed, he was caught telling the jury at least one outright lie.  Forrest first testified (consistently with his recantation), that he had no recollection of Bell mixing heroin, and had no reason for thinking that Bell supplied heroin to an individual nicknamed J-Rock.  After a lunch break, however, during which Forrest spoke with government agents and attorneys (although he first denied having done so, but then later admitted to it), Forrest changed his testimony and stated that he saw Bell mixing heroin, and that he knew Bell sold heroin to J-Rock because Bell specifically asked him to mix heroin for J-Rock.  As Bell observes, this was only one of several instances in which Forrest gave testimony that did not implicate Bell before the lunch break, then changed his story to incriminate Bell after the break.

Forrest's flip-flopping before the jury undermines, rather than supports, Bell's motion. *See Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993). In *Olson*, two witnesses testified before a grand jury that they had not witnessed the murder with which Olson was charged. They then testified before a second grand jury and a petit jury that they *had* witnessed the murder. At trial, the jury heard these competing stories and the witnesses' explanations for them, and it chose to accept the version in which the witnesses saw defendant commit the murder. *Id*. The witnesses later recanted their trial testimony, prompting the defendant to move for a new trial. The judge denied the motion, and the Seventh Circuit affirmed, explaining that the witnesses were "simply trying to change their trial stories back to their original grand jury stories-the same stories that the petit jury heard in cross-examination and rejected." *Id*. Similarly, in this case, Forrest's global recantation essentially reverts back to his testimony in which he disclaimed knowledge of certain aspects of Bell's conduct in furtherance of the drug conspiracy.

It bears noting that my analysis to this point has not taken into account statements Forrest subsequently provided to the government in its investigation of his letter to Bell's counsel. Because I conclude, for the reasons expressed above, that Forrest's letter does not warrant a new trial under either

13

the *Larrison* "false testimony" test or the general test, I need not linger on the details of these statements. I mention them briefly in closing, however, to emphasize that an evidentiary hearing is not warranted.

The government attaches to its opposition the FBI notes memorializing Forrest's statements taken after he sent the letter (or, according to the notes, several letters) to Bell's counsel. These offer a chilling account of Bell's "'power' inside of MCC and other correctional institutions," and they recount various incidents that Forrest interpreted as threats to his safety if he did not disavow his trial testimony in an affidavit or letter to Bell's counsel. Form FD-302 dated 7/22/2015, Def.'s Resp., Exh B. at 1. It is true, as Bell observes, that these later statements do not explicitly recant his recantation. They do, however, state unequivocally that Forrest wrote the letter at Bell's direction; that Bell told Forrest what the letter should say; and that Bell reviewed the letter's contents line-by-line before approving it and placing it in an envelope addressed to his attorney.

Even if Forrest testified consistently with his substantive recantation at a hearing, the government surely would confront him with his detailed statements to the FBI explaining that his recantation was not spontaneous but was made at Bell's behest, and that it was the result of Bell's "power" over his conditions

14

of confinement and his personal safety.  At best, his testimony would merely solidify Forrest's status as a perennially flip-flopping witness, and one whose statements might just as easily be the product of threats by Bell and his henchman as the product of truth.  Under these circumstances, Forrest's testimony—whatever it be—would not leave me "reasonably satisfied" that his trial testimony was false.  Accordingly, an evidentiary hearing would serve no meaningful purpose.

III.

For all of the foregoing reasons, I deny Bell's motion for a new trial.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: October 21, 2015

15